UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRUCE WILLIAMS,

                              Plaintiff,

v.                                                                          5:19-CV-0557
                                                                             (GTS/ATB)
PMA COMPANIES, INC.; PMA MANAGEMENT
CORP.; PMA MANAGEMENT CORP OF NEW
ENGLAND; and JAMES WALSH,

                              Defendants.
_____

APPEARANCES:                                             OF COUNSEL:

THE LAW OFFICES OF WYATT                     TIMOTHY J. BROCK, ESQ.
& ASSOCIATES, PLLC                                   TREVOR BRICE, ESQ.
  Counsel for Plaintiff                                      BENJAMIN J. WYATT, ESQ.
17 Elm Street Suite C211
Keene, NH 0341

BOND, SCHOENECK & KING, PLLC              ROBERT A. LaBERGE, ESQ.
  Counsel for Defendants                                 ADAM P. MASTROLEO, ESQ.
One Lincoln Center
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this employment discrimination action filed by Bruce

Williams ("Plaintiff") against PMA Companies, Inc. ("PMA"), PMA Management Corporation

("PMAMC"), PMA Management Corporation of New England ("PMAMCNE"), and James

Walsh (collectively "Defendants"), is Defendants' motion for summary judgment pursuant to

Fed. R. Civ. P. 56.  (Dkt. No. 32.)   For the reasons set forth below, Defendants' motion is

granted in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claims

Generally, in his Complaint, Plaintiff asserts four claims: (1) a claim that all Defendants discriminated against him based on his age in violation of New York State Human Rights Law Section 296; (2) a claim that Defendants PMA, PMAMC, and PMAMCNE (collectively "the PMA Company Defendants") discriminated against him based on his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et. seq.; (3) a claim that all Defendants retaliated against him in violation of New York State Human Rights Law Section 296, in that the PMA Company Defendants unlawfully coerced, intimidated and threatened him, and/or interfered with his exercise of enjoyment of his rights by subjecting him to adverse actions including termination of his employment, and that Defendant Walsh aided, abetted, incited, coerced, and/or compelled such retaliatory or discriminatory conduct; and (4) a claim that the PMA Company Defendants retaliated against him in violation of the ADEA, 29 U.S.C. § 621 et. seq.  (Dkt. No. 1 [Pl.'s Compl.].)

### B.      Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported with accurate citations by Defendants in their Statement of Material Facts and expressly admitted or denied without appropriate record citations by Plaintiff, in his response thereto.  (*Compare* Dkt. No. 32, Attach. 8 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 44, Attach 2 [Pl.'s Rule 56.1 Resp.].)

1.      PMAMC and PMAMCNE are third-party administrators which provide claims administration and risk management services for self-insured clients, unbundled clients and self-

insured groups in the areas of workers' compensation, commercial auto, commercial property, and general liability.

2.      PMAMC has offices across the United States.  Its largest claims office is located in DeWitt, New York, where PMAMC has more than 89 employees (the "DeWitt Office").

3.      Plaintiff was hired by PMAMC in March 2003 to serve as a Client Services Manager in the claims area.

4.      In May 2008, Plaintiff was promoted to the position of Assistant Vice President of

Claims and assumed responsibility for managing the DeWitt Office.

5.      In June 2009, PMA purchased a small third-party administrator located in Wallingford, Connecticut.  Shortly thereafter, PMAMCNE was formed.  Plaintiff subsequently was asked to manage that office as well and received a correspondingly substantial salary increase.

6.      Even after Plaintiff assumed these additional responsibilities in New England, and

at all times during his employment, Plaintiff's principal work location and his primary responsibility continued to be the DeWitt Office.

7.      In 2018, PMA, PMAMC and PMAMCNE had a procedure for requesting and approving work-from-home arrangements.  That procedure had three steps.

8.      First, an employee who wanted to work from home would initiate the request with his or her supervisor.  Second, if the supervisor was supportive of the request, he or she would submit the request to Human Resources.  Third, and finally, Senior Vice President of Human

Resources and Facilities for PMA, Andrew McGill, would consider and approve or deny the request.  This procedure required the completion of a written form that was ultimately submitted to Human Resources.

9.      According to PMA's Employee Handbook, "All remote work location requests must be approved, in advance, by the Senior Vice President, Human Resources and Facilities Management."

10.      Todd Jacobson, who at the relevant time was the Assistant Vice President of Claims for the Midwest region for PMAMC, did not work remotely in 2018 or at any time relevant to this lawsuit.[1]

11.      In 2018 and at all times relevant to this lawsuit, Michelle James was not employed by PMAMC or PMAMCNE.

12.      Rather, Ms. James is employed by Pennsylvania Manufacturers' Association Insurance Company, which is a different company than PMAMC or PMAMCNE with different leadership.

13.      Ms. James was permitted to work remotely, and her home is located within the area of her responsibility.

---

[1]      Plaintiff testified at his deposition that Mr. Jacobson told Plaintiff that he was working remotely.  (Dkt. No. 32, Attach. 7, at 56-58 [Pl.'s Dep.].)  However, Mr. Jacobson stated in a declaration that he did not ever work remotely (or have approval to work remotely) during the relevant time period.  (Dkt. No. 32, Attach. 6 [Jacobson Decl.]).  Because the only evidence Plaintiff has provided to support his argument regarding Mr. Jacobson working remotely is hearsay, and because it is clear that Plaintiff could not present that evidence in an admissible form (given that there is no indication that the alleged conversation was recorded or written and Mr. Jacobson himself has indicated that his testimony would be different), Plaintiff's testimony at his deposition does not create a genuine dispute of material fact. *See Lopez v. Mathely*, 12-CV-1338, 2015 WL 1447143, at *7 (N.D.N.Y. Mar. 30, 2015) (Suddaby, J.) (noting that "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial").

14.     Ms. James' work-from-home arrangement was warranted based on extenuating personal circumstances.

15.     Plaintiff has no firsthand knowledge of Ms. James or Linda Rice's working arrangements or the basis of those arrangements.

16.     Plaintiff and his wife purchased a home in Myrtle Beach, South Carolina, in June 2018.  This was at the same time that Plaintiff's wife stopped working at her job as a preschool teacher in North Syracuse, New York.

17.     At some point during the summer of 2018, Plaintiff asked Defendant Walsh for permission to perform at least some of his Assistant Vice President responsibilities (located in New York and New England) remotely.

18.     In considering Plaintiff's request, Defendant Walsh spoke to his boss, Frank Altiere.

19.     Mr. Altiere immediately informed Defendant Walsh that he was not in favor of the request, explaining his philosophy that the leaders of the organization needed to be present and visible in the office and should be able to walk around an office and meet with their teams.

20.     Mr. Altiere was also concerned about PMAMC's operation in New York at that particular time due to issues with the performance of the offices under Plaintiff's control.

21.     In particular, Mr. Altiere was concerned about unnecessary fines and turnover in the office, as well as about an issue in which Plaintiff was insubordinate by refusing to follow a directive from Defendant Walsh in 2017.

22.     In accordance with PMA's established procedure, Defendant Walsh also spoke to Mr. McGill about Plaintiff's remote-work request.

23.     Mr. McGill had the final say over whether any remote-work request would be granted.

24.     Mr. McGill likewise was not in favor of Plaintiff's remote-work request.

25.     Following Defendant Walsh's discussions with Mr. Altiere and Mr. McGill, Plaintiff's remote-work request was not approved.

26.     On Tuesday and Wednesday, August 28 and 29, 2018, PMAMC held an off-site strategic planning meeting at Normandy Farm Hotel and Conference Center in Blue Bell, Pennsylvania.

27.     In attendance were most of PMAMC's senior leadership team, including Plaintiff, Mr. Walsh, and Mr. Altiere.

28.     On the morning of Wednesday, August 28, Plaintiff and Mr. Walsh spoke about Plaintiff's remote-work request before the start of the meeting.

29.     After Plaintiff was informed that the request would not be approved, a heated discussion ensued.

30.     Mr. Walsh stated that he understood from this conversation that Plaintiff was resigning his employment and providing his two weeks' notice.[2]

31.     Defendant Walsh immediately advised Mr. Altiere, who was also at this offsite meeting, that Plaintiff had become upset and had resigned.

32.     Defendant Walsh also immediately reported this incident by telephone to PMA Human Resources Manager, Christine Kilgarriff.

33.     Ms. Kilgarriff, in turn, immediately reported Plaintiff's resignation to Mr. McGill

---

[2]     Although Plaintiff disputes this fact, the Court notes that the fact states Defendant Walsh's subjective understanding, and it does not state that Plaintiff in fact resigned from his position.

by contemporaneous email at 8:24 a.m., stating that Plaintiff "ended up quitting and said that he

would work only until September 15th after learning that his remote work request was denied."

34.    The next day (Wednesday, August 29), Mr. McGill spoke to Plaintiff by

telephone.

35.    Mr. McGill took contemporaneous notes during this conversation.

36.    Mr. McGill stated that he understood from this conversation that Plaintiff was

resigning his employment.[3]

37.    Neither Mr. McGill, nor Defendant Walsh, ever told Plaintiff he was being

        "fired"

or "terminated" during any of their discussions with him on or after August 28, 2021.

38.    Mr. McGill felt that the length of Plaintiff's transition period should be kept to a

minimum.

39.    Mr. McGill thereafter consulted Defendant Walsh, John Santulli (President and

Chief Operations Officer of the PMA Companies), Vincent Donnelly (PMA Companies'

Chief Executive Officer), and Mr. Altiere about the length of Plaintiff's transition period.

40.    Mr. Santulli is 66 years old, Mr. Donnelly is 68 years old, and Mr. Altiere is 65

years old.

41.    It was determined as a result of these discussions that the end date of Plaintiff's

_____

[3]    Although Plaintiff has identified contradictory evidence regarding his intention to resign (Dkt. No. 34, Attach. 2, at   40), he fails to dispute Mr. McGill's interpretation of the conversation he had with Plaintiff.  As indicated above in note 2 of this Decision and Order, the Court stresses that this fact does not state that Plaintiff in fact resigned from his position.

transition period would be September 21.

42.     This decision was made no later than the close of business on Thursday, August 30.[4]

43.     Accordingly, at Mr. McGill's request, Ms. Kilgarriff finalized and submitted human resources paperwork, confirming that Plaintiff's pay would continue through September 21, 2018, his official last day of employment.

44.     On Friday, August 31, 2018, Defendant Walsh called Plaintiff to discuss the transition of his duties and to advise him of the end date of this transition period.

45.     After Defendant Walsh had informed Plaintiff that September 21 would be his last day, Plaintiff stated he believed he was being treated differently because of his age.

46.     Plaintiff also stated during this call that he was not "voluntarily" resigning from his position with PMAMC.

47.     Defendant Walsh immediately contacted Human Resources to report that Plaintiff had made this assertion about age discrimination during their telephone conversation.

48.     After receiving this allegation of discrimination, Ms. Kilgarriff and Kyleen Hastie, another member of the Human Resources Department, reached out to Plaintiff the following week to obtain information about his allegation.

49.     During a telephone call on Thursday, September 6, 2018, Plaintiff confirmed that he had said to Defendant Walsh during their telephone call on August 31 that he believed that he had been treated differently because of his age.

---

[4]      Plaintiff again fails to properly dispute Defendants' assertion.  Instead, Plaintiff disputes not the termination decision, but circumstances of the termination itself.  (Dkt. No. 34, Attach. 2, at   46.)

50.     Ms. Kilgarriff and Ms. Hastie took contemporaneous notes during this conversation.

51.     Within two weeks of Plaintiff's last day of employment with Defendants, he began working for Superior Medical Consulting, where he has continued working to the present.

52.     Plaintiff's new position is fully remote.

53.     Plaintiff traveled to Myrtle Beach on September 29, 2018.

54.     Plaintiff spent four weeks in Myrtle beach, from September 29, 2018, through the end of 2018.

55.     Plaintiff spent four months at his home in Myrtle Beach in 2019 following his separation from PMAMC.

56.     Plaintiff listed his home in New York for sale on September 20, 2018, prior to the end date of his employment with PMAMC and PMAMCNE.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, is assumed in this Decision and Order, which is intended primarily for the review of the parties.

**C.     Parties' Briefing on the Defendants' Motion for Summary Judgment**

Generally, in support of their motion for summary judgment, Defendants assert the following three arguments: (1) Plaintiff's arguments concerning the denial of his remote-work request fail as a matter of both law and fact in that (a) the denial of his remote-work request was not an "adverse employment action," (b) the denial of his remote-work request did not occur under "circumstances giving rise to an inference of discrimination" in that he has failed to

identify a similarly situated comparator, and (c) he cannot show that his remote-work request would have been granted "but for" his age; (2) Plaintiff's arguments concerning his separation from employment fail as a matter of both law and fact in that (a) the competent evidence confirms that he resigned from employment on August 28, 2018, (b) irrespective of whether his resignation is perceived as "voluntary" or "involuntary," he cannot establish a *prima facie* case of age discrimination or retaliation because of his lack of evidence establishing that his working conditions were "so intolerable, difficult, or unpleasant" that "a reasonable person would have felt compelled to resign," and Defendants did not change any of Plaintiff's working conditions, much less change them in a deliberate manner designed to force him to resign, (c) Plaintiff's retaliation claim must be dismissed because his allegedly protected activity occurred after the challenged employment action took place, and (d) he cannot sustain his ultimate burden of proof establishing that "but for" his age and/or alleged protected activity, that his employment would not have ended on September 21, 2018; and (3) Plaintiff's claims against Defendant Walsh should be dismissed in that (a) the record evidence confirms that Defendant Walsh did not have the authority to implement either of the challenged employment decisions in this case, and (b) Plaintiff has failed to show that Defendant Walsh has any individual liability under New York State law as an "aider and abettor." (*See generally* Dkt. No. 32, Attach. 9.)

Generally, in opposition to Defendants' motion, Plaintiff asserts the following three arguments: (1) he has put forward sufficient facts for a reasonable jury to conclude that he was discriminatorily subjected to adverse actions due to his age because (a) he was subjected to a harassing and hostile work environment in the form of rumors and Defendant Walsh's verbal harassment on August 28, 2018, (b) he was denied an employment benefit (i.e., remote work)

10

that was provided to multiple younger colleagues, (c) he was terminated because Defendant had no good-faith basis to believe that Plaintiff resigned, and, even if Defendant Walsh was not the final decisionmaker in Plaintiff's termination, Defendants are still liable under a "cat's paw" theory of liability, and (d) in the alternative, even if Defendants' false assertion that Plaintiff resigned were taken as true, then Defendants should have permitted him to rescind his resignation due to Defendants' normal practice of permitting satisfactory employees to rescind their resignation; (2) whether Plaintiff was terminated is a factual dispute that a jury must decide and therefore summary judgment is inappropriate; and (3) Plaintiff was retaliated against, including being terminated, for engaging in a protected activity through (a) raising protected concerns in the conversation in which he first requested to work remotely, (b) further raising age-discrimination concerns on August 28, 2018, after Defendant Walsh denied Plaintiff's work request and a verbal altercation ensued, (c) expressing protected-discrimination concerns to Mr. McGill when he refused to discuss his concerns and instructed Plaintiff not to report to work, (d) expressing protected-discrimination concerns to Defendant Walsh on August 31, 2018, and (e) expressing protected-discrimination concerns to Ms. Hastie and Ms. Kilgarriff on September 6, 2018. (*See generally* Dkt. No. 34, Attach. 1.)

Generally, in reply to Plaintiff's opposition, Defendants repeat the following three arguments asserted in their memorandum of law: (1) Plaintiff did not suffer an "adverse employment action" sufficient to support a claim of age discrimination; (2) Plaintiff failed to show that, "but for" his age or alleged protected activity, his request to work remotely would have been granted and his opposition arguments ignore and utterly fail to satisfy his burden; and (3) Plaintiff failed to show that "but for" his age or allegedly protected activity, his employment

would not have ended on September 21, 2018.  (*See generally* Dkt. No. 35, Attach. 1.)

## II.   RELEVANT LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[5]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[6]

---

[5]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[6]     Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(a)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 (previously Local Rule 7.1[a][3]) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[7]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[8]  Stated another way, when a non-movant fails to oppose a legal argument

---

[7]      *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[8]      *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-

asserted by a movant, the movant may succeed on the argument by showing that the argument

possess facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be

deemed as consent to the granting or denial of the motion, as the case may be, unless good cause

is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30,

2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at

*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Plaintiff's Federal Law Claims

#### 1.   Plaintiff's ADEA Discrimination Claim

After careful consideration, the Court finds that Defendants' motion on Plaintiff's ADEA

discrimination claim should be granted for the reasons stated in Defendants' memoranda of law.

*See, supra*, Part I.C. of this Decision and Order.  To those reasons, the Court adds the following

analysis.

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . .

because of such individual's age."  29 U.S.C. § 623(a).  To establish a *prima facie* case of age

discrimination, the plaintiff must show four things: (1) that he was within the protected age

group; (2) that he was qualified for his position; (3) that he experienced an adverse employment

action; and (4) that the action "occurred under circumstances giving rise to an inference of

---

0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's
failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a
concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

discrimination." *Lively v. WAFRA Investment Advisory Gr., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021). "Once a prima facie case is established, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for the adverse action . . . which the plaintiff in turn may rebut by showing that 'the employer's determination was in fact the result of . . . discrimination.'" *Lively*, 6 F.4th at 302 n.3 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [1973]; *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 [2d Cir. 2008]). "To prevail on an ADEA discrimination claim, it is not sufficient for a plaintiff to show 'that age was simply a motivating factor' in the employer's adverse action," but rather the plaintiff must show that "'age was the but-for cause of the employer's adverse decision.'" *Lively*, 6 F.4th at 303 (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 167, 174, 176 [2009]).

Defendants do not appear to dispute that Plaintiff has shown the first two of these elements. The undisputed evidence indicates that Plaintiff was born in 1956 and was thus 62 years old at the date of the actions relevant to his claims. (Dkt. No. 32, Attach. 7, at 14 [Pl.'s Dep.].) There is also no indication in the admissible evidence presented that Plaintiff was not qualified for his position, nor have Defendants made any assertion of that nature. As a result, the only two factors in contention are (a) whether Plaintiff experienced an adverse employment action, and (b) whether any such actions occurred under circumstances giving rise to an inference of discrimination.

### a.    Adverse Employment Action

"An actionable adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" *Kairam v. West Side GI, LLC*, 983 F. App'x 23, 27 (2d Cir. 2019) (quoting *Kassner v. 2d Ave. Delicatessen Inc.*, 496 F.3d 229, 238 [2d Cir. 2007]).

"'Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Kairam*, 983 F. App'x at 27 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 [2d Cir. 2015]).

As to Defendants' denial of Plaintiff's request for remote work, such denial is not an adverse employment action because it did not change the terms and conditions of Plaintiff's employment; it merely required him to continue to work from the DeWitt office (and travel to the other offices) as he had been doing. *See Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11-12 (2d Cir. 2013) (finding that a denial of the ability to "take advantage of an alternative work schedule that allowed periodic work from home" was not an adverse employment action); *Wheeler v. Bank of New York Mellon*, 16-CV-1176, 2018 WL 3730862, at *9 (N.D.N.Y. Aug. 6, 2018) (Kahn, J.) (finding that denial of a request to work from home could not be considered an adverse employment action even under the "more relaxed" context of a retaliation claim, and noting that, as to discrimination claims, "district courts in the Second Circuit have consistently held that 'denial of work-from-home . . . status' does not constitute an adverse employment action"); *Ray v. New York State Insur. Fund*, 16-CV-2895, 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018) (finding that the plaintiff's request to remote work from a different location did not constitute an adverse employment action as to either her discrimination or retaliation claim because "it did not inconvenience her but rather denied her a convenience by merely requiring her to work from her normal working location"). Plaintiff's citation to two out-of-circuit district court cases to the contrary is not persuasive.

16

To the extent that Plaintiff argues he was somehow denied a guaranteed condition of his employment because the employment handbook contains a procedure for allowing employees to work from home, that argument is baseless. The fact that Defendants, in their discretion, might require or allow some employees to work remotely does not make the ability to work remotely a condition of Plaintiff's employment. Of particular note, nothing in the handbook provision indicates that the ability to work remotely is a "benefit" of Plaintiff's employment as he asserts; rather, the provision is clear that the ability to work remotely is at the sole discretion of Defendants. (Dkt. No. 32, Attach. 2, at 11 [stating that "PMA reserves the sole right to determine what positions and/or employees may be required to work from a remote location," that employees must submit a request for remote work to their manager that must be approved by the Senior Vice President, Human Resources and Facilities Management, and that "[w]orking remotely, whether necessitated by a business need or at the voluntary request of an employee may be rescinded at any time and is solely the discretion of PMA"].)

As to the alleged termination of Plaintiff's employment, it is well established that termination is an adverse employment action. *Kairam*, 983 F. App'x at 27; *see Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (stating that "[p]lainly an employee's 'discharge' . . . is an adverse employment action," and noting that discharge includes "the employer's actual termination of the plaintiff's employment or the existence of intolerable conditions, attributable to the employer, amounting to a 'constructive' discharge"). On this motion, there is a genuine dispute of material fact as to whether Plaintiff's employment was terminated by Defendants (as Plaintiff argues) or whether Plaintiff resigned his employment after his remote-work request was denied (as Defendants argue). Similarly, Plaintiff's assertion that he was not allowed to return to

17

work after the meeting on August 28, 2018, falls somewhere between a suspension and a termination and therefore would constitute an adverse action; however, there exists a number of genuine disputes of material facts as to (a) the nature of the interactions between Mr. Walsh and Plaintiff on August 28, 2018, and August 31, 2018, and (b) whether Mr. Walsh "fired" Plaintiff or whether Plaintiff resigned on August 28, 2018.

As to Plaintiff's argument that Defendants subjected him to a hostile work environment, the Court finds this argument unpersuasive.  To the extent that the creation of a hostile work environment can be considered an adverse employment action for the purposes of a disparate impact claim,[9] a plaintiff must show that "the complained-of 'misconduct in the workplace was so severe as to alter the terms and conditions of the plaintiff's employment.'"  *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 172 (E.D.N.Y. 2015) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 [2d Cir. 2014]).  "In order to show that severe workplace misconduct altered the terms and conditions of a plaintiff's employment, a plaintiff must present evidence that the defendant created, either through a single and 'extraordinarily severe' incident or through a series of 'sufficiently continuous and concerted' incidents, a workplace 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered.'"  *Paul*, 97 F. Supp. 3d at 172 (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 [2d Cir. 2013]).  A consideration of whether the circumstance rose to the level of a hostile work environment involves assessing the "totality

---

[9]     *See Rother v. NYS Dep't of Corrs. and Community Supervision*, 970 F. Supp. 2d 78, 92 (N.D.N.Y. 2013) (Kahn, J.) ("A hostile work environment constitutes an adverse employment action.") (citing *Alfano v. Costello*, 294 F.3d 365, 373 [2d Cir. 2002]); *accord Lee v. Sony BMG Music Ent., Inc.*, 07-CV-6733, 2010 WL 743948, at *7-8 (S.D.N.Y. Mar. 3, 2010) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 143 [2004]).

of the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rother*, 970 F. Supp. 2d at 92 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 [2d Cir. 2012]).

Plaintiff argues that Defendants created a hostile work environment through the following actions: (a) Defendant Walsh asked him his age and how long he planned to continue working at the time Plaintiff made his request for remote work; (b) Defendant Walsh spread false rumors that his request to work remotely was so that he could live in his "supposed retirement home"; (c) Defendant Walsh and other supervisors "strung [him] along for months about his remote work request and [gave him] indications that the remote request would be granted"; (d) Defendant Walsh became very angry, yelled at and insulted Plaintiff, and ordered him to leave the meeting on August 28, 2018; and (e) Defendants revoked his email access on August 28, 2018, after the meeting and he was told to stay home and was not permitted to report to work after that date. (Dkt. No. 34, Attach. 1, at 11-12 [Pl.'s Opp'n Mem. of Law].)  Such facts (many of which are disputed) are insufficient for a reasonable factfinder to conclude that Plaintiff was subjected to a hostile work environment.

Notably, although revoking email access and preventing Plaintiff from reporting to work certainly alter the conditions of his employment and interfere with his job performance, undisputed evidence shows that a termination form was submitted for Plaintiff, effective on August 28, 2018 (although it was noted that Plaintiff should be paid through September 21, 2018).  (Dkt. No. 32, Attach. 4, at 2, 7.)  Although it is disputed when Plaintiff became aware of the fact that he would no longer be employed by Defendants, the admissible evidence shows that

the decision to end Plaintiff's employment (whether because he was fired or because he resigned) was made by August 30, 2018.  (Dkt. No. 32, Attach. 2, at 15.)  With that in mind, a single age-related comment, rumors by Defendant Walsh that Plaintiff wanted to work from his "retirement home," the fact that he had to wait for a response on his remote-work request, and a single instance of being yelled at or insulted (without any evidence of a physical altercation, threat of physical violence, or even the specifics of what "insults" were made) do not rise to level of the conduct that has been found to be sufficient to constitute a hostile work environment. *See Chukwuka v. City of New York*, 513 F. App'x 34, 36-37 (2d Cir. 2013) (finding no reasonable jury could conclude that plaintiff's work environment was hostile where, over a one-year period, he was denied leave of absence to allow him to fulfil familial duties according to Nigerian custom, a supervisor screamed at him and referred to him as a "foreigner" and "this African," and a supervisor directing plaintiff's immediate supervisor to closely monitor him and give him poor performance ratings); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118-19 (2d Cir. 2010) (finding that allegations of defendants wrongfully excluding plaintiff from meetings, excessively criticizing her work, refusing to answer her work-related questions, arbitrarily imposing duties outside of her responsibilities, throwing books, and sending rude emails to her were not sufficiently pervasive or severe); *cf., Desardouin v. City of Rochester*, 708 F.3d 102, 105-06 (2d Cir. 2013) (finding issue of fact as to existence of hostile work environment where sexual comments persisted on a weekly basis for two or three months that were more than merely offensive).

As to Plaintiff's alternative argument that, even if he was not terminated by Defendants, he was constructively discharged, the Court finds that, accepting all of Plaintiff's evidence, a

reasonable factfinder could conclude that he was constructively discharged.  "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Rother v. NYS Dep't of Corrs. and Community Supervision*, 970 F. Supp. 2d 78, 93 (N.D.N.Y. 2013) (Kahn, J.) This inquiry is an objective one, and constitutes a "demanding" standard; indeed, "'a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Rother*, 970 F. Supp. 2d at 93 (quoting *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 [2d Cir. 1993]).  Indeed, a constructive discharge can be found where "the employer gave the plaintiff the choice of resigning or being fired." *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020).  This inquiry focuses on "the working conditions preceding the employee's resignation." *Rother*, 970 F. Supp. 2d at 93.  As already discussed, there is a genuine dispute of material fact as to whether Plaintiff voluntarily resigned at the meeting on August 28, 2018, (as Defendants argue) or he was eventually terminated or forced to acquiesce in resigning (as Plaintiff argues).  Plaintiff's evidence indicates that (a) on August 28, 2018, Defendant Walsh told him to "[j]ust gather [his] things and get out of here," (b) he was blocked from his company email after the conversation with Defendant Walsh on August 28, 2018, (c) he never told anyone that he was quitting or resigning, and (d) despite his statements that he was not quitting or resigning and that he wished to continue working, Defendants repeatedly brought up (and eventually implemented) a plan to transition him out of his job.  (Dkt. No. 34, Attach. 4, at 21-22, 28-33 [Pl.'s Dep.].)

However, as noted previously, undisputed evidence shows that Plaintiff's employment was internally terminated by Defendants effective August 28, 2018, and that such decision was made by August 30, 2018. (Dkt. No. 32, Attach. 4, at 2, 7.) Because Plaintiff was either terminated or resigned by that date, Defendants' actions following that date are irrelevant to the inquiry. *Rother*, 970 F. Supp. 2d at 93. As with the hostile work environment, the remaining conditions (i.e., a single statement about his age, unspecified statements by Defendant Walsh to others that Plaintiff wanted to work from his "retirement home," having to wait a period of time for a decision on his remote work request, being denied the ability to work remotely, and a single incident of being yelled at and/or insulted at a meeting) would not be sufficient to create an atmosphere so intolerable that a reasonable employee would be compelled to quit.

However, there is a genuine dispute of material fact as to whether Plaintiff resigned at all. A reasonable factfinder could conclude that Plaintiff was essentially forced to resign by Defendant Walsh's conduct if, as Plaintiff argues, Defendant Walsh fabricated a rumor that Plaintiff had resigned, and then spread that rumor to Mr. Altiere and Ms. Kilgarriff (who in turn forwarded that rumor to Mr. McGill), such that, only a few days later, the decision to end Plaintiff's employment was made effective;[10] reasonable employees facing such a situation

---

[10]     The Court notes that, even though this theory is based solely on Defendant Walsh's alleged disputed conduct and Defendant Walsh was not the ultimate decisionmaker on whether to formally end Plaintiff's employment, courts within the Second Circuit have recognized that some version of a "cat's paw" theory of liability applies to discriminatory actions taken by a non-decisionmaker. *See Holcomb.*, 521 F.3d at 143 (noting that a "plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process"); *Dickinson v. City Univ. of New York*, 16-CV-1036, 2018 WL 4333986, at *15 and n. 20 (S.D.N.Y. Sept. 11, 2018) (noting that there appeared to be no reason that the cat's paw theory could not apply to ADEA claims, and denying summary judgment in a situation where a jury could reasonably infer that denial of permanent fulltime position as an adverse action could be imputed to employer where supervisor's decision not to reappoint plaintiff for a parttime position was the reason she was prevented from being selected for an interview by the search

would be hard-pressed to expect that they could continue working when their employer has already made the decision to end their employment.  As a result, there is a genuine dispute of material fact as to whether Plaintiff was constructively discharged.

Lastly, Plaintiff argues that, even if he were to be found to have voluntarily resigned, it was an adverse action for Defendants to fail to allow him to rescind his resignation.  The only authority Plaintiff cites for this proposition is an out-of-circuit Circuit-court case.[11]  However, multiple district courts within the Second Circuit have found that a defendant's refusal to rescind a plaintiff's voluntary resignation does not constitute an adverse employment action in a discrimination case.  *Haggerty v. Kaycan, Ltd.*, 19-CV-0507, 2021 WL 1518415, at *6 (D. Conn. Apr. 15, 2021); *Shaw v. Yale New Haven Hosp.*, 18-CV-0067, 2020 WL 1923599, at *8 (D. Conn. Apr. 21, 2020); *Cadet v. Deutsche Bank Secs. Inc.*, 11-CV-7964, 2013 WL 3090690, at *13 (S.D.N.Y. June 18, 2013).  As a result, the Court finds that, even if the evidence showed that Plaintiff resigned and then attempted to rescind his resignation, a failure to accept that recission would not be an adverse employment action as a matter of law.

In sum, as to Plaintiff's discrimination claim, there is at least a genuine dispute of material fact as to whether he can show the existence of an adverse action based on termination or constructive discharge, as well as a genuine dispute of material fact as to whether Plaintiff's employment was in fact terminated as opposed to him having resigned.

_____

committee for the fulltime position).

[11]     The Court notes that this case was related to a retaliation claim, not a discrimination claim, and, as will be discussed later in this Decision and Order, the standard for what constitutes an adverse employment action under retaliation claims is different than the standard for discrimination claims.  Additionally, this case does not stand for the proposition that recission of a resignation will always be an adverse employment action, but rather that it depends on the specific facts of the case and whether the failure to accept the recission was retaliatory.  *Porter v. Houma Terrebonne Housing Auth. Bd. Of Comm'rs*, 810 F.3d 940, 947 (5th Cir. 2015).

b.      **Inference of Discrimination**

However, even if genuine disputes of material fact exist as to whether Plaintiff suffered

an adverse action, the Court finds that summary judgment must be granted on Plaintiff's

discrimination claim because he has not shown that any such adverse action creates an inference

of discrimination under the circumstances.

"A plaintiff can raise an inference of age discrimination by showing that [he] (1) was

similarly situated to other younger employees, and (2) was treated less favorably than those

employees." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015) (citing

*Raspardo*, 770 F.3d at 126). "This 'comparator' does not need to be 'identical' to the plaintiff;

only 'similarly situated in all material respects.'" *Ehrbar*, 131 F. Supp. 3d at 21 (quoting

*Raspardo*, 770 F.3d at 126). Although those "material respects" will "vary somewhat from case

to case," the factors to consider are whether the plaintiff and his comparator were (1) "subject to

the same performance evaluation and discipline standards," and (2) "engaged in comparable

conduct." *Ruiz v. Cnty of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010). Additionally, "[t]he

employees' positions, job responsibilities, and reporting structures are relevant," although "an

employee with a different supervisor can still serve as a comparator where the employee and the

comparator were 'subject to the same workplace standards and disciplinary procedures.'"

*Ehrbar*, 131 F. Supp. 3d at 21 (citing cases).

Here, Plaintiff alleges that younger employees were permitted to work remotely, while

his request to work remotely was denied. However, as discussed above, the Court finds that the

denial of an ability to work remotely was not an adverse action because it did not change the

terms and conditions of his employment or deny him any benefit. As a result, whether or not

Plaintiff was treated differently with respect to the denial of his remote work request, such treatment cannot constitute an inference of discrimination to support his claim because it must be the *adverse employment action* that "occurred under circumstances giving rise to an inference of discrimination." *Lively*, 6 F.4th at 302 n.3. Notably, Plaintiff has failed to adduce admissible evidence about any other factor related to these comparators' job performance or other relevant attributes or circumstances (other than the fact that they were younger than him) that would show that his termination or constructive discharge (assuming the factfinder accepted his version of events rather than Defendants' argument that Plaintiff resigned) was based in age discrimination. (Dkt. No. 1, at ¶¶ 28-34 [Pl.'s Compl.].) Thus, these comparators cannot serve as evidence of age-related discrimination to support his discrimination claim.[12]

---

[12]     In any event, even if the Court were to consider these comparators, Defendants are correct that no reasonable factfinder could find that they are sufficiently similarly situated. Although Michelle James was also an Assistant Vice President of Claims, the evidence cited by Plaintiff acknowledges that the granting of her request to work remotely was related to "a specific personal situation" she had at that time, and Mr. Carney qualified that it was not true that Ms. James "worked primarily from her home." (Dkt. No. 34, Attach. 4, at 69 [Carney Dep.]; Dkt. No. 32, Attach. 2, at ¶ 18 [McGill Decl.].) Plaintiff, on the other hand, has not shown that he had any specific personal circumstance requiring him to work from home, merely that he wished to be able to work from his home in Myrtle Beach for part of the year. As to Linda Rice, Plaintiff's belief that she worked remotely is based on information he allegedly received from Todd Jacobson, and he believed she was also an Assistant Vice President, but he did not know if that was her actual position and he did not know what her duties were in comparison with his own. (Dkt. No. 32, Attach. 7, at 55-56 [Pl.'s Dep.].) Because Plaintiff has not provided any evidence of Ms. Rice's duties, but merely that she was "a Vice President who managed several offices, similar to me," he has not shown that Ms. Rice is a sufficiently similar individual for the purposes of comparison. As to Mr. Jacobson, the Court finds that Plaintiff's argument that Mr. Jacobson worked remotely during the relevant time is unsupported by admissible evidence as discussed above in note 1 of this Decision and Order. As to Vicky Halpen and Karrie Root, Plaintiff does not dispute that both of these individuals were "Senior ACRs", which, according to the organizational chart provided by Defendants, means they were multiple steps below Plaintiff in terms of structural responsibility and thus not reasonably comparable to Plaintiff. (*See* Dkt. No. 35, at 4 [showing that ACRs and Senior ACRs are overseen by Regional Claims Supervisors, who are overseen by an Assistant Claims Manager, who is in turn overseen by the Assistant Vice President].) Lastly, as to Tara Shertenlieb, although she was hired in a Vice President position, it was as a Vice President of Marketing (not

Apart from the alleged comparators, Plaintiff alleges that (a) Defendant Walsh made a number of comments related to his age, including asking him "in a demeaning manner" how old he was and how much longer he planned to work in response to his request to work remotely, and (b) he believed, based on comments by Mr. McGill and others about his "transition period" after the meeting of August 28, 2018, that Defendant Walsh had been "spreading false rumors" that he was retiring.  (Dkt. No. 34 Attach. 5, at ¶¶ 26, 58 [Pl.'s Aff.].)  Defendant Walsh's deposition testimony indicates that he told Mr. Altiere that Plaintiff "was purchasing a home in Myrtle Beach that he planned to retire to."  (Dkt. No. 32, Attach. 7, at 198 [Walsh Decl.].)  Even if these allegations were believed, no reasonable fact finder could conclude that the circumstances gave rise to an inference of discrimination.

"Stray age-related remarks are insufficient to raise an inference of discriminatory motive unless they '(1) [were] made repeatedly, (2) drew a direct link between [discriminatory] stereotypes and the adverse employment decision, and (3) were made by supervisors who played a substantial role in the decision to terminate.'"  *Lively*, 6 F.4th at 306 (quoting *Naumovski v. Norris*, 934 F.3d 200, 216 n.47 [2d Cir. 2019]).  Here, Plaintiff argues that Defendant Walsh, on a single occasion, asked him his age and how long he planned to continue working, in a manner that Plaintiff subjectively interpreted as "demeaning."  However, Plaintiff's subjective belief that this isolated question was demeaning is not sufficient to raise a reasonable inference that the question was discriminatory.  Additionally, although it appears undisputed that Defendant Walsh

Claims), her duties were different from Plaintiff's duties, she directly supervised only three individuals, she was hired to work out of her home from the beginning of her employment (rather than requesting to work remotely after-the-fact), she was permitted to work remotely as an incentive for her to accept the offer of employment, and she was hired months after Plaintiff stopped working for Defendants.  (Dkt. No. 32, Attach. 7, at 579, 581 [McGill Dep.]; Dkt. No. 35, at 7.)  None of these individuals show the requisite level of sufficient similarity based on the admissible evidence.

told at least Mr. Altiere that Plaintiff was purchasing a home that Plaintiff planned to retire to, such comment does not suggest that any of Defendants' actions were motivated by age-related discriminatory animus; indeed, there is no evidence that such comment indicated to Mr. Altiere that Plaintiff was intending to retire in the near future, merely that he was purchasing a home he was planning to live in when he retired.  There is also no evidence to support Plaintiff's subjective belief that Defendant Walsh was spreading rumors of Plaintiff's impending retirement, given that, as already noted, there is no evidence he mentioned anything about Plaintiff retiring to anyone but Mr. Altiere in the comment noted above.  Plaintiff has failed to show that these two comments were anything more than isolated remarks, and thus they do not rise to the level of creating an inference of discrimination based on age.  *See Chowdhury v. Sadovnik*, 17-CV-2613, 2017 WL 4083157, at *5 (E.D.N.Y. Sept. 14, 2017) (finding that statements to Plaintiff that he was "old and [had] no computer skills," that his "skin look[ed] like Sadovnik's father's skin," and that Sadovnik wanted to "replace [Plaintiff] with someone who is young and has computer skills" were insufficient to raise a plausible inference that the adverse employment actions were due to age discrimination); *Spruill v. New York City Health and Hosps. Corp.*, 06-CV-11362, 2008 WL 3911015, at *2-3 (S.D.N.Y. Aug. 25, 2008) (finding that two isolated remarks that the plaintiff was a "thirty-year waste," and that the department would be better off without the senior officers were insufficient to create an inference of discrimination).

Additionally, Plaintiff alleges in his Complaint that he was replaced by an individual who was more than five years younger than him.  (Dkt. No. 1, at ¶ 101; Dkt. No. 34, Attach. 1, at 9 [Pl.'s Opp'n Mem. of Law].)  John Santulli testified at his deposition that, following Plaintiff's

departure, his position was first temporarily filled by Defendant Walsh and then "split up" into

two director/manager-level positions, one for Syracuse and one for Wallingford.  (Dkt. No. 34,

Attach. 4, at 116 [Santulli Dep.].)  Defendant Walsh affirmed that he replaced Plaintiff such that

"[a]ll of his management team reported directly to [Defendant Walsh]" until changes to the

regions were made "some months after [Plaintiff's] departure, and Todd Gancarz was made the

Director of Claims for the White Plains and Syracuse offices, while David Alofs was made the

Director of Operations Claims for the New England office.  (Dkt. No. 32, Attach. 7, at 262-66

[Walsh Dep.].)  Defendant Walsh also testified that, at some point he did not recall exactly, Mr.

Gancarz was promoted to Plaintiff's old position.[13]  (*Id.* at 267.)  However, even assuming that

Mr. Gancarz eventually fully replaced Plaintiff, the evidence is insufficient to create an inference

of discrimination.  Under the law of the Second Circuit, an employer's knowledge that there is

an age discrepancy between a discharged employee and his replacement (i.e., that the employer

knows that the replacement employee is significantly younger than the discharged employee)

can support an inference of discriminatory intent.  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69,

77-79 (2d Cir. 2005) (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 317 [2d Cir. 1999]).

Plaintiff states in his declaration that Mr. Gancarz is "more than 10 years younger than [him]";[14]

however, there is no evidence of Mr. Gancarz's actual age, nor has Plaintiff adduced any

---

[13]     This is at odds with Defendant Walsh's declaration, in which he states that Defendants
did not hire an Assistant Vice President of Claims to replace Plaintiff, but rather "assigned
several individuals to assume portions of Plaintiff's responsibilities with differing titles."  (Dkt.
No. 32, Attach. 1, at ¶¶ 49-52 [Walsh Decl.].)

[14]     In his Complaint, Plaintiff alleges that he was replaced by an individual who was "more
than 5 years younger than [him]."  (Dkt. No. 1, at ¶ 101 [Pl.'s Compl.].)  In Plaintiff's counter-
statement of material facts, he asserts that Mr. Gancarz is "more than 15 years younger than
[him]."  (Dkt. No. 34, Attach. 3, at 14.)  However, again, there is no evidence of Mr. Gancarz's
date of birth to indicate how much younger than Plaintiff Mr. Gancarz is.

admissible evidence to create a genuine dispute of material fact about Defendants' *knowledge* of Mr. Gancarz's age.  As discussed above, it is not the mere fact that a replacement is significantly younger that raises an inference of discrimination based on age, but rather the employer's knowledge of that fact.  Defendant Walsh testified at his deposition that he does not know how old Mr. Gancarz is.  (Dkt. No. 32, Attach. 7, at 263 [Walsh Dep.].)  Indeed, Plaintiff has pointed to no evidence in the record that any of the relevant decisionmakers had any knowledge of Mr. Gancarz's age, much less in relation to Plaintiff's age.  *See Woodman*, 411 F.3d at 80-81 (holding that "some evidence of  . . . knowledge [as to the alleged significant age discrepancy] is required to support the inference necessary to establish a *prima facie* case").  Plaintiff has not even adduced admissible evidence to show how old Mr. Gancarz is.  It may be that, due to Mr. Gancarz's appearance or another factor, his age (and the age discrepancy between him and Plaintiff) would have been obvious.  However, under the circumstances here--where Plaintiff has failed to establish both (a) the extent of the age discrepancy between him and Mr. Gancarz and (b) that Defendants had any knowledge (or the basis for why they should have such knowledge) of such age discrepancy--the Court finds that the evidence that Plaintiff was replaced with a younger employee does not raise an inference of discrimination sufficient to support a *prima facie* case.

Additionally, as Defendants argue, at least three factors exist in this case that undermine any inference of age discrimination.  First, Plaintiff was within the protected age class when he was promoted to his position as Assistant Vice President.  *See Bruder v. Jewish Bd. Of Family and Children's Services*, 10-CV-5951, 2013 WL 789231, at *7 (E.D.N.Y. Mar. 4, 2013) (noting that "[a]ny inference of age animus is undermined because Plaintiff was well within the

protected age group when she was hired and promoted") (collecting cases).  It is undisputed that

Plaintiff was promoted to his position as the Assistant Vice President of Claims in May 2008,

when he was 52 years old; thus, he was already within the protected class when Defendants

promoted him.  Second, supervisors involved in the decision to promote Plaintiff were also

involved in the process of ending his employment.  *See Krause v. Kelahan*, 17-CV-1045, 2020

WL 2838859, at *15 (N.D.N.Y. May 29, 2020) (Kahn, J.) ("When the same actor hires a person

already within the protected class, and then later fires that same person, it is difficult to impute to

her an invidious motivation that would be inconsistent with the decision to hire."); *Colandrea v.

Hunter-Tannersville Cent. Sch. Dist.*, 15-CV-0456, 2017 WL 1082439, at *9 (N.D.N.Y. Mar. 22,

2017) (Kahn, J.) (noting that the same-actor inference applies even where multiple people were

involved in the hiring and firing decisions, "so long as one management-level employee played a

substantial role in both the hiring and firing of the plaintiff").  Specifically, in his deposition,

Plaintiff acknowledges that individuals such as Mr. Mathog, Mr. Santulli, Mr. Altiere and Mr.

McGill were involved in granting him the promotion to Assistant Vice President and salary

raises.  (Dkt. No. 32, Attach. 7, at 23 [Pl.'s Dep.].)  Third, many of those same supervisor-

decisionmakers are themselves within the protected age class.  *See Taddeo v. L.M. Berry and

Co.*, 08-CV-6109, 2012 WL 3535873, at *5 n.3 (W.D.N.Y. Aug. 15, 2012) (agreeing with other

courts that "any inference of discrimination is severely weakened when the decisionmaker is a

member of the relevant protected class"); *accord, Moore v. Kingsbrook Jewish Med. Ctr.*, 11-

CV-3625, 2013 WL 3968748, at *11 (E.D.N.Y. July 30, 2013) (collecting cases).  Specifically,

in 2018, Defendant Walsh was approximately 57 years old, Mr. McGill was approximately 53

years old, Mr. Altiere was approximately 62 years old, Mr. Santulli was approximately 63 years

old, and Mr. Donnelly was approximately 65 years old.  (Dkt. No. 32, Attach. 1, at ¶ 2 [Walsh Decl.]; Dkt. No. 32, Attach. 2, at ¶¶ 2, 33 [McGill Decl.]; Dkt. No. 32, Attach. 3, at ¶ 2 [Altiere Decl.].)  Although individually none of these factors mandates finding that Plaintiff has failed to raise an inference of age discrimination, collectively they undermine any already weak showing based on two disputed comments by Defendant Walsh and the fact that Mr. Gancarz was younger than Plaintiff to an indeterminate extent.

Based on the above, the Court finds that, although questions of fact exist as to the occurrence of adverse employment actions, Plaintiff has not established that a reasonable factfinder could conclude that the circumstances create an inference of discrimination, and therefore Plaintiff has not established a *prima facie* case for discrimination under the ADEA. The Court therefore finds that summary judgment is appropriate on this claim.

### 2.      Plaintiff's ADEA Retaliation Claim

After careful consideration, the Court finds that Defendants' motion on Plaintiff's ADEA retaliation claim should be denied for the following reasons.

"The ADEA also includes an antiretaliation provision that makes it 'unlawful for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by [the ADEA].'"  *Lively*, 6 F.4th at 303.  To establish a *prima facie* case of retaliation, the plaintiff must show four things: (1) that the plaintiff participated in a protected activity; (2) that the defendant knew of the protected activity; (3) that the plaintiff experienced an adverse employment action; and (4) that there is a causal connection between the protected activity and the adverse employment action.  *Lively*, 6 F.4th at 303 n.6. As with a discrimination claim, for a retaliation claim, once the plaintiff establishes a prima facie

31

case, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for its adverse actions, which plaintiff has the burden to rebut by showing that "'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Lively*, 6 F.4th at 304 (quoting *Univ. of Texas S.W. Medical Ctr. v. Nassar*, 570 U.S. 338, 360 [2013]).  In other words, the desire to retaliate based on the plaintiff's age must have been the but-for cause of the adverse action.  *Lively*, 6 F.4th at 304.

Here, it is undisputed that, at some time before Plaintiff ceased working for Defendants, he reported to Defendant Walsh and others (such as Ms. Kilgarriff and Ms. Hastie) that he believed he was being discriminated against based on his age.  As a result, the first two elements of Plaintiff's retaliation claim are not in dispute.

### a.   Adverse Employment Action

For the purposes of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 [2006]).  This standard is "less demanding" than required for a discrimination claim. *Benson v. Family Dollar Stores, Inc.*, 12-CV-1457, 2017 WL 11576213, at *7 (N.D.N.Y. Mar. 31, 2017) (Mordue, J.) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 [2006]).

As an initial matter, there is a genuine dispute of material fact as to *when* Plaintiff first reported that he felt he was being discriminated against based on his age.  Plaintiff argues that he first raised concerns to Defendant Walsh at the time he presented Defendant Walsh with his request to work remotely that considering his age in relation to that request or insinuating he was

in the process of retiring was discriminatory based on his age; he alleges that he again raised these concerns to Defendant Walsh on August 28, 2018, to Mr. McGill on August 29, 2018 (at which time he told Mr. McGill he believed Defendant Walsh had discriminated against him by bringing up his age and denying his remote work request and had retaliated against him by harassing him in response to his raising those protected concerns), to Defendant Walsh on August 31, 2018, and to Ms. Kilgarriff and Ms. Hastie on September 6, 2018 (at which time he told them that he believed the denial of his remote work request and the "apparent initiative to push me out of the Company" was due to his age).  (Dkt. No. 34, Attach. 5, at ¶¶ 26-31, 39-42, 53, 64-66, 68-69 [Pl.'s Aff.].)  Defendants, on the other hand, argue that the first time Plaintiff told anyone with Defendants that he was being discriminated against because of his age was during his conversation with Defendant Walsh on August 31, 2018.  (Dkt. No. 32, Attach. 1, at ¶¶ 37, 45-46 [Walsh Decl.]; Dkt. No. 32, Attach. 4, at ¶¶ 12-13 [Kilgarriff Decl.]; Dkt. No. 32, Attach. 5, at ¶¶ 3-4 [Hastie Decl.].)  Because retaliation cannot occur before protected concerns are communicated, there is a genuine dispute of fact as to what alleged actions would qualify as adverse employment actions for the purposes of Plaintiff's retaliation claim.  *See James v. Annucci*, 17-CV-0843, 2018 WL 4565771, at *3 (N.D.N.Y. Sept. 24, 2018) (Suddaby, C.J.) ("Alleged protected activity that occurs after the adverse action cannot be a substantial cause of the adverse action.").

Additionally, as discussed above in relation to Plaintiff's discrimination claim, there is a genuine dispute of material fact as to whether he suffered an adverse action at all.  Specifically, each side has adduced contrary admissible evidence on the issue of whether Plaintiff was

fired/constructively discharged or whether he resigned.[15]  Thus, multiple issues of fact must be

resolved before a conclusion can be reached as to whether Plaintiff has shown that he suffered an

adverse employment action for the purposes of his retaliation claim.

> **b.    Causal Connection**

In retaliation cases, "[c]ausation can be demonstrated 'indirectly by showing that the

protected activity was followed closely by discriminatory treatment, through other evidence such

as disparate treatment of fellow employees who engaged in similar conduct, or directly through

evidence of retaliatory animus directed against a plaintiff by the defendant.'"  *Benson*, 2017 WL

11576213, at *7 (quoting *De Cintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 [2d Cir.

1987]).

In this case, the alleged termination/constructive discharge occurred soon after the

---

[15]      The Court finds that, regardless of when Plaintiff made his first report of age
discrimination to Defendants, the denial of his request to work remotely and the refusal to allow
him to rescind his resignation (should he be found to have made one) do not constitute adverse
employment actions for many of the same reasons discussed above in Part III.A.1.a of this
Decision and Order.  Specific to the retaliation standard, neither of these actions would be likely
to dissuade a reasonable worker from making a charge of discrimination.  Specifically, the fact
that Defendants have allowed some employees to rescind resignations does not transform their
failure to allow Plaintiff to do so here into an actionable adverse employment action.  Indeed,
Plaintiff offers no evidence to support any argument that he knew at the relevant time that
Defendants allowed employees to rescind resignations under certain circumstances, and thus he
has not shown that such past practice would have given him an expectation of being able to
rescind a resignation.  Plaintiff's reliance on *Porter* is unavailing, because Plaintiff has not
shown that there was any basis for finding that "a reasonable employee in [his] shoes might have
legitimately expected that [his] recission of resignation would be accepted."  *Porter*, 810 F.3d at
947-48.  Unlike in *Porter*, no one with Defendants ever asked Plaintiff to consider rescinding his
resignation, and Defendants did not approve any request to allow Plaintiff to stay on for a
significant time past his effective resignation date in a way that would cause him to believe
recission of resignation was an option.  *Porter*, 810 F.3d at 947-48.  To the contrary, Mr. McGill
indicates that, although Defendant Walsh initially recommended a longer transition period
related to Plaintiff, Mr. McGill decided that a longer transition period was unnecessary in light
of tensions between Plaintiff and Defendants.  (Dkt. No. 32, Attach. 2, at ¶¶ 31-32 [McGill
Decl.].)

alleged protected activity.  Plaintiff made his complaints of age discrimination at some point

between July 2018 (when Plaintiff asserts he made his first notification that he felt discriminated

against in conjunction with Defendant Walsh's disputed response to his request for the ability to

work remotely) and August 31, 2018, and his termination was noted to be effective August 28,

2018, although his employment officially ended September 21, 2018.  (Dkt. No. 32, Attach. 4, at

3 ¶ 10, and 7; Dkt. No. 32, Attach. 7, at 29 [Pl.'s Dep.].)  Such temporal proximity is sufficient at

the *prima facie* case stage to establish that there was a causal connection between Plaintiff's

report of discrimination and the adverse actions he suffered (again, subject to resolution of

genuine disputes of material fact related to when he made his first report of discrimination and

whether he was terminated or constructively discharged in Plaintiff's favor).  *See El Sayed v.*

*Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010) (finding that demonstrating temporal

proximity between plaintiff's complaint and discharge was sufficient to establish a *prima facie*

case of retaliation, but that more sufficient evidence was required after defendants proffered a

nonretaliatory reason in order to establish but-for causation).

Because the issues of fact related to whether Plaintiff suffered an adverse action make it

impossible for the Court to determine whether he has established (or can establish) a *prima facie*

case, the Court finds that summary judgment on Plaintiff's retaliation claim under the ADEA

inappropriate.

### B.     Plaintiff's State Law Claims

As an initial matter, the Court notes that the standards of review for claims of

discrimination and retaliation under the NYSHRL is "virtually identical" to the standards applied

above as to Plaintiff's federal law claims.  *Langella v. Mahopac Cent. Sch. Dist.*, 18-CV-10023,

2020 WL 2836760, at *14 (S.D.N.Y. May 31, 2020); *see also Ehrbar*, 131 F. Supp. 3d at 19-20

(noting that discrimination claims under the ADEA and NYSHRL are both assessed under the

same burden-shifting standard).

### 1.    Plaintiff's NYSHRL Discrimination Claim

For the same reasons as discussed above in Part III.A.1. of this Decision and Order, the

Court finds that Plaintiff's claim for age discrimination under the NYSHRL must be dismissed.

### 2.    Plaintiff's NYSHRL Retaliation Claim

For the same reasons as discussed above in Part III.A.2. of this Decision and Order, the

Court finds that Plaintiff's claim for retaliation based on age under the NYSHRL must, as a

general matter, survive summary judgment.

However, in addition to seeking summary judgment on Plaintiff's state law retaliation

claim as a general matter, Defendants also specifically seek summary judgment on the state law

claims against Defendant Walsh based on liability as an "aider and abettor" on the theory that,

even if he were not the ultimate decisionmaker in terminating Plaintiff (if it were found that

Defendants terminated him rather than that Plaintiff resigned), his improper discriminatory and

retaliatory animus caused the adverse employment action.  (Dkt. No. 32, Attach. 9, at 30-31

[Defs.' Mem. of Law].)  Generally, under the NYSHRL, "an individual is properly subject to

liability for discrimination when that individual qualifies as an 'employer,'" but a coworker who

"lacks the authority to either hire or fire the plaintiff may still be held liable as an aider-abettor

under NYSHRL § 296(6) if he actually participates in the conduct giving rise to a discrimination

claim."  *Comerford v. Vill. Of N. Syracuse*, 18-CV-1143, 2021 WL 950974, at *24 (N.D.N.Y.

Mar. 12, 2021) (Sannes, J.); *see also* N.Y. Exec. L. § 296(6) (stating that "it shall be an unlawful

36

discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so").

Defendants' arguments on this issue are undermined by genuine disputes of material fact that have already been identified (i.e., arguments that Defendant Walsh did not participate in any discriminatory or retaliatory conduct related to Plaintiff and did not mention Plaintiff's age, retirement plans, or protected activity in discussions related to Plaintiff's remote work request and his eventual separation from employment).  Because Defendant Walsh's role and actions related to the alleged retaliation (as well as the time frame of Plaintiff's retaliation claim) is disputed, the Court declines to grant summary judgment related to the remaining NYSHRL claim against Defendant Walsh.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 32) is **GRANTED** **in part and** **DENIED** **in part**; and it is further

**ORDERED** that Plaintiff's age-discrimination claims under the ADEA and the NYSHRL are **DISMISSED**; and it is further

**ORDERED** that **SURVIVING** Defendant's motion for summary judgment are Plaintiff's retaliation claims under the ADEA and the NYSHRL; and it is further

**ORDERED** that Plaintiff is directed to forward a written settlement demand to defendants no later than **October 8, 2021,** and the parties are directed to thereafter engage in meaningful settlement negotiations. The parties are directed to jointly file, on or before **November 1, 2021**, a status report regarding their settlement discussions and if a settlement conference would be beneficial or a jury trial date should be scheduled.

Dated: September 30, 2021
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge